## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KEILA ROBLES FIGUEROA, on behalf of her minor daughter KAMILA<br><br>Plaintiff<br><br>VS.<br><br>PRESBYTERIAN COMMUNITY HOSPITAL, INC., or alternatively, John Doe Corporation, d/b/a PRESBYTERIAN COMMUNITY HOSPITAL; DR. JUAN C. CASTAÑER BARCELÓ, his wife MARY ROE and their conjugal partnership; DR. RICHARD ROE, his wife JANE ROE and their conjugal partnership; JOHN DOES 1, 2 and 3; A, B and C CORPORATIONS; UNKNOWN INSURANCE COMPANIES A through H<br><br>Defendants | CIVIL NO.: 22-<br><br>PLAINTIFF DEMANDS TRIAL BY JURY |

## COMPLAINT

**TO THE HONORABLE COURT:**

Plaintiff, a minor who is herein represented by her mother Keila Robles Figueroa, through her undersigned attorneys, very respectfully states and prays as follows:

### JURISDICTION AND VENUE

1. The events or omissions giving rise to the claims set forth in this action all occurred within the District of Puerto Rico and the Commonwealth of Puerto Rico.

2. Federal jurisdiction in this case is attained under diversity pursuant to section 1332 of Title 28, United States Code. Venue is appropriate in this judicial district pursuant to section 1391(b) of Title 28, United States Code.

1

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

## THE PARTIES

4. Plaintiff is a minor whose interests are herein represented by her mother, Keila Robles Figueroa ("Mrs. Robles"). Plaintiff and Mrs. Robles are residents of Pittsburgh, Pennsylvania.

5. Codefendant, Presbyterian Community Hospital, Inc. or, alternatively, John Doe Corporation d/b/a Presbyterian Community Hospital, Inc. ("Presbyterian Community Hospital"), is the commercial and/or corporate name of a hospital institution located and with principal place of business in San Juan, Puerto Rico that offers medical services to the public.

6. Codefendant Dr. Juan C. Castañer Barceló ("Dr. Castañer"), is a physician authorized to practice in the Commonwealth of Puerto Rico and for all purposes of this action is the legal representative of the conjugal partnership he constitutes with his wife Mary Roe. Dr. Castañer had medical privileges to practice medicine at and/or was an agent of codefendant Presbyterian Community Hospital at all times relevant to this case, and committed negligent acts or omissions that caused and/or contributed to causing plaintiffs damages. In the alternative, he was a contractor or an employee of a contractor of Presbyterian Community Hospital.

7. Codefendant Dr. Richard Roe ("Dr. Roe"), whose real name is unknown and will be substituted as soon as practicable, is a physician authorized to practice in the Commonwealth of Puerto Rico, and for all purposes of this action is the legal representative of the conjugal partnership he constitutes with his wife Betty Roe. Dr. Roe had medical privileges to practice medicine at and/or was an agent of codefendant

2

Presbyterian Community Hospital at all times relevant to this case and committed negligent acts or omissions that caused and/or contributed to causing plaintiffs damages.

In the alternative, he was a contractor or an employee of a contractor of Presbyterian Community Hospital, Dr. Richard Roe ("Dr. Roe"), whose real name is unknown and will be substituted as soon as practicable, is a physician authorized to practice in the Commonwealth of Puerto Rico, and for all purposes of this action is the legal representative of the conjugal partnership he constitutes with his wife Betty Roe. Dr. Roe had medical privileges to practice medicine at and/or was an agent of codefendant Presbyterian Community Hospital at all times relevant to this case and committed negligent acts or omissions that caused and/or contributed to causing plaintiffs damages. In the alternative, he was a contractor or an employee of a contractor of Presbyterian Community Hospital.

8. Codefendants John Does 1, 2 and 3 and A, B and C Corporations are persons and/or corporations, whose identities are presently unknown, who committed negligent acts or omissions that caused and/or contributed to causing plaintiff's damages. In the alternative, they are third parties and/or defendants of unknown identities who caused and/or contributed to causing plaintiff's damages.

9. Unknown Insurance Companies A through H, insurers whose identities are presently unknown, insured the aforementioned defendants, and are jointly responsible with their respective insureds for the damages claimed herein pursuant to section 2003 of Title 26 of the Annotated Laws of Puerto Rico.

10. All of the named defendants are jointly and severally responsible to plaintiff for the damages caused to her. All defendants fictitiously named herein, will be correctly named once their identities are determined through discovery.

## THE FACTS

11. Keila Robles Figueroa was a 41-year-old Puerto Rican female who was G3 P 1 Ab 1 at the time of her pregnancy, which was an in vitro fertilization pregnancy with eggs frozen in 2011. On August 29, 2018 she had her first endovaginal ultrasound at Hospital HIMA - San. Pablo.

12. She had numerous ultrasound studies to monitor fetal growth. A urinary tract infection was treated on October 24, 2018 and low thyroid test results were noted on September 28, 2018. On December 26, 2018 she was diagnosed with a yeast infection and began treatment with Terazol. Serial non stress tests were done to monitor fetal well-being. Her estimated date of confinement as April 13, 2019. The non-stress test on January 24, 2019 was reactive.

13. At the outset of prenatal care, on September 12, 2018, she weighed 181 pounds and on January 24, 2019 at 28 6/7 weeks gestation she weighed 191 pounds. During her first pregnancy, she was found to have a unicornuate uterus. Her prior delivery, on January 18, 2012, was a cesarean section at term for an 8 pound female infant who was a breech presentation.

14. Her prenatal labs were unremarkable except for a low thyroid test. She was 0+, antibody negative, rubella immune HepB neg, GC neg, chlamydia neg, Varicella neg, Hgb A1A2, 1 hr glucose tolerance test 92, VDRL neg, HIV neg, AFP neg. Her one-hour glucose tolerance test on December 13, 2018 was 120 (normal) and fasting blood sugar was 83. Level II ultrasound testing did not identify any anomaly, cervical length was appropriate for size and dates.

15.     The pregnancy was complicated by premature rupture of the membranes, preterm labor, Advanced Maternal Age (AMA) and a urinary tract infection. It does not appear that Plaintiff received steroids for fetal lung maturation which was a departure from the standard of care for an anticipated preterm delivery. At the cesarean section a didelphys uterus was identified.

16.     Delivery was on February 3, 2019 by cesarean section with spinal anesthesia at Presbyterian Community Hospital.

17.     Plaintiff was born at 29 and 3/7 weeks gestation via cesarean section on February 3, 2019 at 19:03 (7:03 PM). She was born from the vertex presentation in the presence of clear amniotic fluid. She was resuscitated with drying, suctioning, stimulation and oxygen. Her Apgar scores were 8 at 1 minute and 8 at 5 minutes. She weighed 1233 g (3 pounds 1 oz) (26-50%), measured 35 cm in length (4-10%) with a head circumference of 28 cm (51 - 75%). She was admitted to the Neonatal Intensive Care Unit at Presbyterian Community Hospital and treated for respiratory distress (RDS). An umbilical artery catheter and an umbilical vein catheter were placed on February 3, 2019 and removed on February 7, 2019. She had minimal cranial molding.

18.     She received blow by oxygen in the delivery room and was admitted to the NICU and started on noninvasive respiratory support (N—CPAP) and oxygen. Due to worsening of her RDS she was subsequently intubated and placed on a ventilator. The OCR had a ground glass appearance consistent with RDS.

19.     On February 7 high flow nasal cannula (HFNC) and oxygen requirements were gradually decreased to 25% oxygen at 1 1/2 L/min.

20. Caffeine was started on February 4, 2019 for intermittent apneic episodes. On February 10 she had increased apnea despite caffeine and high flow nasal cannula (HFNC) so a septic work up was done and antibiotics restarted.

21. The frequency of the apnea episodes decreased after Zozyn and Vancomycin were stated but after 48 hours the antibiotics were discontinued when the blood and urine cultures showed no growth. Her C-reactive protein was < 0.29 on February 4, 2019. She ingested nothing by mouth on February 16 and on February 17 she was intubated for assisted ventilation due to her critical condition. Her CBC/dif showed a left shift suggesting she had an infection. No spinal tap was done. Antibiotics were subsequently restarted.

22. Plaintiff was placed on nasal continuous positive airway pressure (CPAP) of +6 and 60% $O_2$ from February 3 to February 5 for mild to moderate RDS and then again from February 5 to February 7 for apnea. A chest x-ray (CXR) on February 3, 2019 showed RDS. High Flow Nasal Cannula was used to deliver CPAP from February 7, 2019 to February 17, 2019 until her deterioration on February 17, 2019 when she required intubation and assisted ventilation. Prompt surfactant therapy was not administered for her RDS even though she required up to 60% $O_2$ and had a CXR that was consistent with RDS. Curosurf was not given until February 14, 2019. This was a serious departure from the standard of care which was a substantial factor in her subsequent problems and injury. Likewise, the failure by the obstetrician to administer antenatal steroids (betamethasone) was a departure from the standard of care. It was a substantial contributing factor in the development of her RDS, apnea and subsequent gut perfusion issues, metabolic/acidosis and eventually the development of necrotizing enterocolitis.

23. A head ultrasound was done on February 10, 2019 (7 days) and this was reportedly normal.

24. She initially received starter total parenteral nutrition which was gradually advanced and intralipids were added. Supplemental calcium was required. On February 5, 2019 she began to receive trophic feeds of 0.5 ml every three hours of expressed maternal breastmilk. Feedings were advanced with both breast milk and formula plus intravenous fluids of TPN/IL. On February 10, 2019 Human Milk Fortifier was added to the milk when she was only seven days old. Initially this was made up to achieve 22 Calories/ounce. This was tolerated on February 11, 2019 Breast milk plus Human Milk Fortifier or Similac Special Care 24 calories (SSC/24) at 16 ml/feed every three hours by oral glucose tolerance tests (OGT) plus low-rate tube feeds total parenteral nutrition/IL.

25. Feedings were tolerated on February 12, 2019. Probiotics were added on February 13, 2019 and enteral feeds were now at 20 ml every three hours of 24 Calorie/ounce feeds. Feedings were increased to 22 ml/feed every three hours of 24 Calorie (breast milk plus HMF or SSC/24). This was an inappropriately aggressive advancement of feeds in view of her recent history of frequent apneic and bradycardic episodes which posed a compromise to gut integrity.

26. On February 16, 2019 at 23:30 she was placed on nothing by mouth because of abdominal distention with dilated loops of bowel, consistent with necrotizing enterocolitis Stage I.

27. On February 17, 2019, at Presbyterian Community Hospital, her condition deteriorated. She had to be intubated and ventilated. Her abdomen was distended and bilious fluid was draining from her nasogastric tube. It does not appear that a Replogle tube

7

with intermittent suction was used when she was placed on nothing by mouth, another departure from the standard of care. A blood culture was done and antibiotics started. Necrotizing enterocolitis was diagnosed as well as an increased metabolic acidosis with bicarb =17 and BE -11.6, reflecting the enteric necrosis.

28. Prior to transport, dopamine at 5 mcg/kg was started because of poor perfusion and low blood pressure, her abdominal girth was 26.5 cm and there was abdominal tenderness and a violaceous discoloration of her abdomen, particularly in the periumbilical area. Bowel sounds were absent. She received sodium bicarbonate correction and saline bolus infusion. She was transferred to the Hospital Pediátrico Universitario, a level four institution for surgical consultation/intervention after this was recommended to the parents who were oriented to the infant's condition. A note at 16:04 on February 17, 2019 indicated that an attempt was made to transfer her but no bed was available at the Hospital Pediátrico Universitario. There was a delay in achieving surgical assessment/intervention of at least 12 hours.

29. On February 17, 2019 in the morning, the infant appeared critically ill and at 11:38 a.m. it was noted that there was blood in her stool. An abdominal x-ray (KUB) showed distended loops of bowel with suspected pneumatosis intestinalis. Surgical consultation/transfer was sought from pediatric surgeon Dr. Álvarez Allende, but he was unavailable and no other pediatric surgeon or institution was recommended. Only close observation and antibiotics were recommended. Antibiotics had been started twelve hours earlier. Transfer did not occur at this time. Her complete blood count (CBC)/differential had 10 bands. She was given a blood transfusion on February 17, 2019.

30. Further deterioration occurred on February 17, 2019 when her abdomen became rigid and discolored. Hospital Pediátrico Universitario was re-contacted and Dr. Zayas accepted the infant for STAT surgical consultation/transfer. Intermittent suction was now applied to the nasogastric tube for bowel decompression. More likely than not, perforation of her bowel had occurred and peritonitis was present. Surgical intervention was indicated.

31. On February 17, 2019 at 21:01, her CBC had WBC 6.1, Hgb 13; HCT 39, with 65 neutrophils, 25 lymphs and 11 monos.

32. Sepsis had been suspected on February 10, 2019 because of increased apneic episodes. On February 17, 2019, cultures were obtained and Vancomycin and Meropenem were given. The CBC was unremarkable except for mild anemia. The dosage for Vancomycin was increased based on a low trough level. Cultures were no growth and antibiotics were discontinued after 48 hours. Her BIM was sodium Na = 143, K = 5,4, CL = 111, CO2= 18, BUN = 13, CR = 1.07, Glu = 165 and Ca = 10.

33. Arterial blood gas on February 17, 2019 at 21:00 = pH 731 PC $O_2$ 34, P $O_2$ 151, HCO3 17.1, BE -8.1 which slowed a partially compensated metabolic acidosis which was persistent and CM bowel necrosis and an indication for surgical intervention.

34. Plaintiff was transferred to University of Puerto Rico Hospital at 14 days of age. At that time, she weighed 1195 grams, measured 39.5 cm in length and had a head circumference of 27.5 cm at 31 3/7 postmenstrual weeks of age. She was intubated and being ventilated on 30% 02, IMV 60, 15/6 pressure support 10. Her medications included Meropenem, Vancomycin, Fentanyl for pain relief and Dopamine was at 10 mcg/kg/min for perfusion support. Her vital signs were: P = 184, T = 98.2, BP 53/41, 46 mean. Intralipids

were discontinued and fluids were increased to 180 ml/kg/day of TPN. Her urine output was 2.2 ml/kg/hour and glucose before transfer was 124 mg/dl. The TPN was decreased to 5% glucose because of hyperglycemia which was probably sepsis related on February 17, 2019.

35.    Plaintiff was admitted to the Neonatal Intensive Care Unit at University of Puerto Rico Hospital on February 17, 2019 and remained there for 4 months due to severe complications from necrotizing enterocolitis that required multiple surgeries and resections. Consequently, she developed short bowel syndrome, and was referred to the University of Pittsburg Intestinal Rehabilitation Center and Transplant Center for Intestinal Rehabilitation. She was TPN dependent and had multiple episodes of sepsis/infections including:

- Urine Culture: 2/19/19, 2/23/19 Candida Albicans
- Blood Culture: Candida Parapsilosis 3/16/19, 3/19/19, 3/20/19, 3/21/19, 3/22/19, 3/25/19, 5/30/19, 6/4/19
- Blood Culture: Staphylococcus Hominis 3/24/19, 3/29/19
- Blood Culture Staphylococcus epidermidis 3/25/19
- Blood Culture: Enterococcus Faecalis: 5/24/19, 5/26/19, 5/28/19

36.    Plaintiff did not have prompt surgical intervention on February 17, 2019 following her transfer to University of Puerto Rico Hospital. Flagyl was added to her antibiotic regimen which was Meropenem and Vancomycin at that time. A drain was not placed and paracentesis was not done to assess for the presence of peritoneal soilage, to decompress and to drain air and peritoneal fluid. Low intermittent nasogastric tube suction was continued and serial KUB films were obtained. Her abdomen was distended but

10

reportedly the previously noted periumbilical discoloration was no longer present. Gut rest was continued and no free air was seen on KUB films. She required ongoing dopamine to maintain mean arterial pressure (MAP) and perfusion. A positive urine culture for Candida Albicans was obtained on February 19, 2019 and Amphotericin was begun.

37.     The infant was taken to the operating room for an exploratory laparotomy on February 28, 2019 after she passed a large bloody/mucous stool. At this time discoloration in the periumbilical area was observed, which is an ominous sign and is often found when perforation and peritoneal soiling has occurred. She had metabolic acidosis documented several times after admission which is consistent with acidosis from necrotic bowel. This was not addressed and surgery was markedly delayed. Evidence of prior bowel perforation was present at the time of surgery including:

- Frozen abdomen - a condition where adhesions developed between the abdominal viscera and the anterior abdominal wall. The evolution of this process requires many days and reflects the impact of delayed intervention.
- Extensive/abundant bowel liquefaction necrosis (old insult) was encountered in addition to a grossly contaminated peritoneal cavity. Again, this process required days for liquefaction necrosis to evolve from an ischemic insult(s).
- Multiple segments of non-viable bowel, due to full thickness, ischemic insults were encountered and resected.
- Extensive anastomoses were done to try to preserve intestinal length but the salvaged amount of bowel was markedly reduced and lead to Short Gut Syndrome.

38.     Transfer and surgical intervention were delayed. Perforation had obviously occurred by February 17, 2019 when her abdomen was distended and rigid and her periumbilical area was discolored. Surgery to decompress and remove necrotic

segments was indicated. Delayed surgery resulted in prolonged impact of necrotic bowel, disseminated intravascular coagulation (DIC) and further loss of bowel.

39. Dr. Antonio Ortiz

Plaintiff was admitted on February 17, 2019 at 23:15 to Pediatric University Hospital and discharged on June 18, 2019. The diagnoses included:

1. Preterm AGA, very low birth weight
2. Twin pregnancy
3. Necrotizing enteriocolitis
4. Abdominal distention
5. Direct hyperbilhubinemia due to cholestasis
6. IVH Grade 1 – II
7. Thrombocytopenia
8. UTI (fungus) (candida albicans)
9. Anemia of prematurity (transfused)
10. Respiratory Distress Syndrome (RDS)
11. S/P gastrostomy
12. Enterectomy anastomosis and jeyunostomy and mucus fistula
13. Apnea of prematurity
14. Fungenica (persistent) candida parapsiosis
15. DIC (Disseminated Intravascular Coagulation)
16. Staphylococcal hominis infection and staphylococcal epidermidis
17. Nephrolithiosis
18. Enterococcus wound infection
19. Abdominal wound infection
20. Poor weight gain
21. Post-exploratory laparotomy with ostomy takes down and stricturoplasty
22. Short bowel syndrome
23. Patent ductus syndrome artercosus (PDA)
24. Pulmonary Artery Hypertension
25. Atrial septal defect
26. Transfusion of fresh frozen plasma
27. Transfusion of platelets

40. On June 18, 2019 the infant was transferred to Children's Hospital of Pittsburgh at the University of Pittsburgh Medical Center for further care of her Short Bowel Syndrome and Intestinal Rehabilitation.

12

41. The family relocated to Pittsburgh, PA in order to access special GI/surgical services that Plaintiff requires for her post-NEC short gut condition.

42. The failure to administer antenatal steroids (betamethasone) to Mrs. Keila Robles Figueroa in a preterm, high risk, twin pregnancy known to be at risk for RDS (Respiratory Distress Syndrome) caused Plaintiff to develop clinical and radiological evidence of RDS with increased respiratory distress requiring increased amount of oxygen and ventilatory pressure support.

43. Similarly, the delayed administration of surfactant to Plaintiff resulted in her lungs being exposed to high concentrations of oxygen and pressure. Since no antenatal steroids had been administered the increased risk of clinically significant RDS should have been obvious and early surfactant administered.

44. The consequences of these departures caused Plaintiff to have episodes of apnea and desaturation which compromised gut integrity. In combination with her prematurity and an inappropriately aggressive feeding regime, this led to sever necrotizing enterocolitis (NEC). Delays in identification of surgical NEC, transfer for surgery and surgical intervention resulted in the loss of a large portion of her intestines and the development of Short Gut Syndrome. These delays were departures from the standard of care as well as the inappropriate feeding regime.

45. As a result of her episodes of hypoxia and altered perfusion she also suffered irreversible brain damage with resultant developmental delay and abnormal neurological function including autistic-like behavior. Absent her significant RDS and NEC and their sequelae, Plaintiff would likely have developed normally.

46. As a result of defendants' negligence and the birth injuries she sustained, Plaintiff is a severely and permanently injured child with cerebral palsy and the ensuing host of disabilities, defects and abnormalities related to the condition, who has no hope of a normal life and will require lifelong care for her condition.

47. Because her parents have limited economic resources, Plaintiff has not been able to receive sufficient quality professional care or therapy to help her deal with her physical, neurological and emotional conditions.

48. The conditions of Plaintiff were caused by the defendants' negligence, all of whom departed from the medical standards of care and otherwise failed to act in a prudent, reasonable or responsible manner in the medical care provided to Mrs. Robles and her baby, and in fact caused the child's present and future condition.

49. The result of the defendants' failure to prevent, properly diagnose and treat Mrs. Robles and Plaintiff conditions prior, during and after her birth has been devastating. Plaintiff now is catastrophically injured, with severe brain damage and physical abnormalities that are permanent and incapacitating. Her damages resulting from defendants' negligence are reasonably estimated at a sum in excess of $15,000,000., including the cost of her long-term, life-long care.

### FIRST CAUSE OF ACTION
### MEDICAL MALPRACTICE, VICARIOUS LIABILITY
### 31 LPRA § 5141, 5142

50. The allegations contained in the preceding paragraphs are incorporated by reference and are fully reproduced herein.

51. Presbyterian Community Hospital, Dr. Castañer, Dr. Roe and the Doe Defendants had a duty to provide medical care to Mrs. Robles and to Plaintiff that

complied with the applicable standards of the medical profession. Notwithstanding, Presbyterian Community Hospital, Dr. Castañer, Dr. Roe and the Doe Defendants breached that duty as set forth above.

52. Presbyterian Community Hospital is further vicariously liable for the negligent acts and/or omissions incurred by the other defendants herein that it employed, contracted with and/or granted privileges to, and by its medical and nursing staff that intervened with Mrs. Robles and her baby, for its negligence in the selection, monitoring, supervision and granting of privileges to said doctors and nurses, including Dr. Castañer, Dr. Roe and the Doe Defendants.

53. There is a clear and direct causal link between Presbyterian Community Hospital, Dr. Castañer, Dr. Roe and the Doe Defendants' medical malpractice and the damages sustained by plaintiff, as set forth above.

## SECOND CAUSE OF ACTION
## DIRECT ACTION AGAINST INSURERS - 26 LPRA §2003

54. The allegations contained in the preceding paragraphs are incorporated by reference and are fully reproduced herein.

55. Defendants Unknown Insurance Companies A through H have a contractual obligation to compensate those who are damaged by the medical errors and omissions of Presbyterian Community Hospital, Dr. Castañer, Dr. Roe and/or the Doe Defendants. As set forth above, those defendants committed medical malpractice with respect to Mrs. Robles and her baby. Moreover, there is a clear and direct causal link between this negligence and the damages sustained by plaintiff, as set forth above.

56.     Under 26 LPRA § 2003, plaintiff has a right to reclaim directly against the corresponding insurers of Presbyterian Community Hospital, Dr. Castañer, Dr. Roe and the Doe Defendants.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable of right by a jury in the complaint set forth above.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter final judgment against defendants as follows:

1.   Declaring defendants to be in violation of 32 LPRA §§ 5141 and 5142, and 26 LPRA § 2003.

2.   Finding defendants jointly and severally liable to plaintiff for the damages sustained by plaintiff, plus applicable interest, costs and attorney's fees.

3.   Awarding plaintiff such other and further relief at law or in equity as this Court may deem just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 29th day of July, 2022.

s/ David Efron
**DAVID EFRON**
USDC-PR No. 125701
**LAW OFFICES DAVID EFRON, PC**
*Attorneys for Plaintiff*
PO Box 29314
San Juan, PR 00929-0314
Tel. (787) 753-6455
Fax (787) 758-5515
efron@davidefronlaw.com

16